IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2024

## JAQUAN GATHING v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 14-03635        Lee V. Coffee, Judge

_____

**No. W2023-00596-CCA-R3-PC**
_____

The petitioner, Jaquan Gathing, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

Shae Atkinson (at post-conviction hearing) and Bianka Y. Valdez (on appeal), Memphis, Tennessee, for the appellant, Jaquan Gathing.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Steve Mulroy, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for one count of attempted especially aggravated robbery, two counts of aggravated assault, two counts of facilitation of aggravated assault, one count of facilitation of attempted aggravated robbery, and one count of especially aggravated robbery, as follows:

On March 13, 2014, Mr. [Eric] Cain, Ms. [Myisha] White, Mr. [Deangelo] Terry [(collectively "the victims")], and Mr. [Rico] Johnson were visiting at the apartment of Ms. Danneisha Stinson. At around 2:00 or 3:00 a.m., the victims and Mr. Johnson went outside into the parking lot to look for the key to Mr. Terry's vehicle when they were attacked. Mr. Cain testified that there were two attackers, Ms. White testified that there were three attackers, and Mr. Terry testified that there were three attackers. Ms. Stinson observed the attack from her upstairs window and testified that there were three or four attackers. The victims testified that the attackers were wearing masks and bandanas.

Using a sawed-off shotgun, a pistol, and a hatchet, the attackers forced Mr. Cain, Ms. White, and Mr. Terry to the ground and instructed the victims to take off their clothes and "to give [the attackers] what they had." The attackers "snatched" the clothes off of Mr. Cain. Mr. Cain saw the attackers "torture" Mr. Terry and Ms. White. Mr. Cain was hit repeatedly, and his face was slammed into the ground, knocking him unconscious. Mr. Terry was hit in the head with the hatchet before passing out. Ms. White watched as Mr. Terry and Mr. Cain were "brutalized" before the attackers did the same to her. The attackers picked up Mr. Cain, threw him on top of Mr. Terry, and said they were going to kill them. Upon hearing police sirens, the attackers ran away with the items they took from the victims.

Ms. Stinson was still in the upstairs apartment when the attack occurred. From her window, Ms. Stinson saw Mr. Terry, Mr. Cain, and Ms. White lying on the ground in the parking lot and the attackers beating the victims with a gun and "a long metal object like a knife." The attackers "were swinging a long metal object back and forth, and you could hear it hit." She heard a gunshot, and she was "scared" and "panicking." She tried to call 9-1-1 on Ms. White's tablet, but was unsuccessful in her attempts.

During the attack, Mr. Johnson came back upstairs and knocked on Ms. Stinson's door. Ms. Stinson let Mr. Johnson inside, and he also tried to call 9-1-1. After Mr. Johnson went back outside, the victims came upstairs. Ms. Stinson testified that Ms. White had stab wounds to the head, Mr. Cain had "blood and chunks of meat everywhere," and Mr. Terry was unconscious on the living room floor. An officer responding to the scene described Mr. Cain as having "his ear hanging off" and described Mr. Terry's head, neck, and collar bone area as "chopped up." Mr. Terry was put on oxygen and was going in and out of consciousness. The victims and Mr. Johnson were all transported to the hospital for treatment for their wounds.

Officer Wayne Greygor of the Memphis Police Department responded to a call about the robbery in progress at approximately 3:00 a.m. When entering the apartment complex, Officer Greygor turned the direction normally used as an exit, believing that the attackers would come from that direction if they attempted to leave the apartment complex. He saw a gold or beige sport utility vehicle ("SUV") coming toward him. It stopped and turned its headlights off. Officer Greygor pulled to the side and turned his headlights off, as well. After about thirty seconds, the SUV's headlights turned back on, and it started to drive toward Officer Greygor. He then turned on his headlights and activated his blue lights, pulling into the middle of the road in an attempt to block the vehicle from leaving. The SUV went around Officer Greygor and kept going, so Officer Greygor turned around and followed it.

While Officer Greygor was following the SUV, he saw a black male wearing dark clothing jump out from the front passenger door. The man was described as "about the same size" as Defendant Prince Parker. As the man jumped, a mask and green bandana were dropped or thrown from the car. Officer Greygor continued to follow the SUV until another patrol car stopped the SUV from the front. The two officers ordered everyone out of the SUV at gunpoint and detained them. Co-defendant Danielle Brown was driving the SUV at the time. [The petitioner] and Co-defendant Morgan Edwards were both in the back seat. Mr. Parker was not in the vehicle at the time.

. . . .

After the [d]efendants had been arrested, Sergeant George Cave overheard a discussion between [the petitioner] and Mr. Parker, who were in separate rooms with an adjoining wall between them. They attempted to speak to each other through the wall, and Sergeant Cave heard Mr. Parker "saying something to the effect [of], 'Don't tell them anything,' and [the petitioner] saying something to the effect of, 'I didn't tell them anything, I didn't tell them nothing.'" [Mr. Prince and the petitioner] were later moved away from each other.

The SUV was towed to the Crime Scene Office and searched pursuant to a search warrant. The items found inside the SUV included a sawed-off shotgun with duct tape wrapped around the handle, a Tec-9 pistol, a magazine for the Tec-9 containing thirteen rounds, a yellow shotgun shell, what appeared to be a bloodstain on the inside of the passenger door, a pair

of bloody latex gloves, a dollar bill with blood on it, a red bandana, a "skull cap," a wallet, various articles of clothing, and two pairs of tennis shoes.

During the trial, Ms. Brown, a co-defendant, testified on behalf of the State that she was Mr. Parker's girlfriend at the time of the attack. Prior to the attack, Mr. Parker had told Ms. Brown that he knew some people who had "a lot of money and weed" and that he planned to rob them. Mr. Parker drove his SUV to the apartment complex, with Ms. Brown in the front passenger seat and Mr. Edwards and [the petitioner] in the back seat. They pulled to the back of the complex and parked. Mr. Parker and [the petitioner] put masks and bandanas over their faces and got out of the vehicle while Ms. Brown remained in the vehicle with Mr. Edwards. Although Ms. Brown was aware of the two guns in the vehicle, she did not see Mr. Parker or [the petitioner] leave with the weapons. Ms. Brown moved to the driver's seat to play with the radio while [the petitioner] and Mr. Parker were gone. She testified that they were gone for thirty minutes to an hour before returning to the vehicle. Upon their return, they were "calm," and there was "no screaming" and "no excitement." Mr. Parker got into the front passenger seat and told Ms. Brown to drive. Ms. Brown did so but stopped the vehicle when she saw police cars in front of her. When the car was stopped, Mr. Parker got out of the vehicle and jumped over a gate. Ms. Brown testified that when Mr. Parker returned to the scene after she had been placed in a patrol car, he was wearing different clothes than he was wearing during the robbery.

. . . .

The victims each testified to injuries sustained in the attack. Mr. Cain testified that he remembered waking up in the hospital with a "[b]roken jaw, wound to the back of the head, a cut up ear, beat up knees, bruised ribs," and a cut around his eye that was still leaking fluid into his eye at the time of trial. His ear had to be reattached, and he remained in the hospital for a week. Although Ms. White did not take off her clothes after being told to do so by her attackers, she remembered waking up in the hospital wearing only her "boxers and a wife beater." She had bruised ribs from being kicked and two stab wounds in the back of her head, and she remembered being knocked out with a "big gun." Mr. Terry remembered being hit in the head, "knock[ing] some of [his] dreads out." He had cuts to his hand from attempting to protect his head during the attack. He also testified at trial that he still suffered from headaches from the attack.

- 4 -

. . . .

Special Agent Donna Nelson of the Tennessee Bureau of Investigation ("TBI") provided expert testimony regarding DNA testing of some of the items found in the SUV and at the scene of the attack. Mr. Parker's DNA was found on the nose and mouth area of the ski mask that fell out of the car while Officer Greygor was following it. Ms. White's DNA was found in a sample taken from a bloodstain from the inside door of the SUV. The "skull cap" found in the SUV contained [the petitioner's] DNA, and one of the gloves from the SUV contained Mr. Edwards's DNA. The tennis shoes [the petitioner] was wearing the night of the incident had both [the petitioner's] DNA and Ms. White's DNA on them. A bloodstain on [the petitioner's] pants from that night had DNA from both [the petitioner] and Mr. Cain.

. . . .

The jury found both [the petitioner] and Mr. Parker not guilty of all three counts of attempted first degree murder. The jury found [the petitioner] guilty of one count of attempted especially aggravated robbery of Mr. Cain, one count of aggravated assault of Mr. Cain, one count of facilitation of aggravated assault of Mr. Cain, one count of facilitation of attempted aggravated robbery of Ms. White, one count of aggravated assault of Ms. White, one count of facilitation of aggravated assault of Ms. White, and one count of especially aggravated robbery of Mr. Terry. The trial court merged the aggravated assault of Mr. Cain and facilitation of aggravated assault of Mr. Cain with the attempted especially aggravated robbery of Mr. Cain. The trial court also merged the facilitation of aggravated assault of Ms. White with the aggravated assault of Ms. White. [The petitioner] received an effective sentence of forty-seven years of imprisonment.

*State v. Gathing*, No. W2016-02076-CCA-R3-CD, 2018 WL 486001, at *1-5 (Tenn. Crim. App. Jan. 19, 2018), *perm. app. denied* (Tenn. May 17, 2018).

Following the denial of his direct appeal, the petitioner filed a pro se petition for post-conviction relief on January 28, 2019, arguing, in part, that trial counsel was ineffective for failing to communicate with the petitioner. Counsel was appointed, and the petitioner filed an amended petition in which he argued, in part, trial counsel was ineffective for failing to meet with the petitioner as necessary, failing to adequately conduct a pre-trial investigation, and failing to secure a proper appellate record. An evidentiary

hearing was held on September 23, 2022, during which the petitioner and trial counsel testified.[1]

Trial counsel testified that he was appointed to represent the petitioner following his preliminary hearing. Trial counsel met with the petitioner following each of the petitioner's court appearances and answered any questions the petitioner had. Additionally, trial counsel visited the petitioner in jail and responded to the petitioner's questions through letters. Trial counsel reviewed discovery with the petitioner and provided him with a copy of the discovery materials. On cross-examination, trial counsel agreed the petitioner had eighteen court appearances prior to trial, and trial counsel met with the petitioner at each appearance to discuss the petitioner's case.

Regarding pretrial investigation, trial counsel testified that he did not hire an investigator in this case because "there was not much in dispute, other than [the petitioner] saying he was not the person who was involved." Although witnesses placed the petitioner at the crime scene and the petitioner admitted to being present during the commission of the crime, the petitioner stated that he was merely "breaking it up." Additionally, because the potential witnesses were affiliated with gangs and the petitioner assured trial counsel that they would not testify, trial counsel chose not to speak with them prior to trial. On cross-examination, trial counsel agreed that because of the witnesses' gang affiliation and the brutality of the attacks, he did not believe the witnesses would speak to him even if he tried to contact them.

When trial counsel was preparing the appellate record, he noticed that a portion of one of the transcripts was incomplete. Following an investigation, trial counsel discovered that the audio of the transcript was not fully recorded. Therefore, trial counsel filed a motion with this Court which included an affidavit from the court reporter stating that the entire record was not recorded and that portions of the audio were missing. Trial counsel testified that when a record is incomplete attorneys are required to submit their notes from trial in order to complete the record. However, rather than submit his notes, trial counsel chose to argue on direct appeal that the court reporter, as a party of the State, lost or destroyed evidence, and he believed that argument "[was] less effective or essentially [did not] exist if you're just writing the notes as to what was missing and filling in the blanks."

The petitioner testified that there was not "a substantial amount of conversation" between trial counsel and the petitioner. According to the petitioner, the only in-depth conversations he had with trial counsel were at the petitioner's court appearances. Although trial counsel also visited the petitioner at jail, "it wasn't that long for us to just

---

[1] We limit our recitation of the testimony at the evidentiary hearing to that relevant to the petitioner's issues on appeal.

get anything establish[ed] to me to really fully understand what was taking place, because I was ignorant of the law at the time and didn't really understand what was going on." The petitioner agreed that trial counsel provided him with a copy of his discovery; however, trial counsel did not go over it with the petitioner "in full detail."

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

### *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to conduct an adequate investigation, failing to communicate with the petitioner, and failing to properly preserve the record. The State contends the post-conviction court properly denied relief. Upon our review, we agree with the State.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I. Failure to Investigate

The petitioner argues trial counsel was ineffective for failing to investigate witnesses and possible defenses. Although the petitioner denied participating in the crime, trial counsel failed to hire an investigator or speak to potential witnesses prior to trial. The State contends the post-conviction court properly found that trial counsel was not ineffective for failing to investigate.

At the evidentiary hearing, trial counsel testified that he did not hire an investigator in this case because "there was not much in dispute, other than [the petitioner] saying he was not the person who was involved." Trial counsel did not speak with potential witnesses believing they would not meet with him because of their gang affiliation and the brutality of the attack. Although the petitioner argues that trial counsel should have interviewed potential witnesses prior to trial or hired a private investigator, he failed to present any witnesses at the evidentiary hearing or state what information further investigation would have revealed or how it would have altered the outcome of the trial, and therefore cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Furthermore, the post-conviction court accredited the testimony of trial counsel, and

nothing in the record preponderates against its findings. *See Tidwell*, 922 S.W.2d at 500. The petitioner is not entitled to relief on this issue.

## II.     Failure to Communicate

The petitioner argues trial counsel was ineffective for failing to adequately consult the petitioner about critical decisions. The petitioner contends communication was "minimal, infrequent, and resulted in a bar complaint." The State contends the post-conviction court properly found that trial counsel was not ineffective for failing to communicate with the petitioner.

At the evidentiary hearing, trial counsel testified he spoke with the petitioner following each court appearance, visited the petitioner in jail, and communicated with the petitioner through letters. Trial counsel reviewed discovery with the petitioner and provided him with a copy of the discovery materials. The petitioner testified that trial counsel spoke with him at every court appearance but stated that there was not "a substantial amount of conversation." Although trial counsel also visited the petitioner at jail, "it wasn't that long for us to just get anything establish[ed]." The petitioner also agreed that trial counsel provided him with a copy of his discovery but stated trial counsel did not go over it "in full detail."

As noted above, the post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against its findings. *See Tidwell*, 922 S.W.2d at 500. Thus, the petitioner has not shown deficient performance on the part of trial counsel. Furthermore, the petitioner has failed to establish a reasonable probability that the result of the proceeding would have been different if trial counsel had spent more time with him, especially in light of the overwhelming evidence against the petitioner. *Strickland*, 466 U.S. at 694. The petitioner is not entitled to relief on this issue.

## III.     Failure to Properly Preserve the Record

The petitioner argues trial counsel was ineffective for failing to properly preserve the record on direct appeal in violation of Tennessee Rule of Appellate Procedure 24(b). The petitioner contends that trial counsel's failure to supplement the appellate record on direct appeal with the missing portions of the trial transcript "left the Court unable to adequately address[] issues and unable to review a full and complete record." The State contends the post-conviction court properly found that trial counsel was not ineffective for failing to properly preserve the appellate record.

At the evidentiary hearing, trial counsel testified that he noticed a portion of one of the transcripts was incomplete due to missing audio when preparing the record during the

petitioner's direct appeal.  Although trial counsel knew that he was required to provide his trial notes when the record was incomplete, trial counsel instead chose to argue on direct appeal that the court reporter, as a party of the State, lost or destroyed evidence, and he believed that argument "[was] less effective or essentially [did not] exist if you're just writing the notes as to what was missing and filling in the blanks."

As noted above, trial counsel's testimony indicates that he considered submitting his trial notes as required by Tennessee Rule of Appellate Procedure 24(c).  However, he made a strategic and informed decision to argue that the court reporter, as a State actor, lost or destroyed evidence.  Trial counsel believed that submitting his trial notes under 24(c) would undercut this argument.  The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court.  *See Tidwell*, 922 S.W.2d at 500.  In addition, the fact that a strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel.  *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).  Deference is given to sound tactical decisions made after adequate preparation for the case.  *Id.*  The petitioner is not entitled to relief on this issue.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE